IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BUTTE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR 12-15-BU-DLC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER |
| | ) | |
| COURTNEY CAL GARDENIER, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Defendant Courtney Cal Gardenier has filed a motion to suppress all the tangible evidence obtained from two searches conducted during the investigation of this matter. She also seeks to suppress the statements that she made to law enforcement during the second search. The government opposes the motion. For the reasons stated below, the motion is denied in full.

## FACTUAL BACKGROUND

Gardenier was the target of an investigation into the distribution of molly and ecstasy (two different forms of the Schedule I substance methylenedioxy-N-methylamphetamine or MDMA) in the Bozeman area. She had been identified as the source of supply by two people who received molly in the

mail on November 9, 2011, as part of a controlled delivery.

One of these recipients became a confidential informant (CI) who assisted the Missouri River Drug Task Force ("Task Force") in arranging a controlled purchase of 500 tablets of ecstasy from Gardenier through the mail. Special Agent Rod Noe, a member of the Department of Homeland Security and the Task Force, testified that the package was never intended to actually reach the CI's possession, that this was discussed with the CI, and the CI understood that. The CI signed a consent form agreeing to cooperate with the Task Force "for the purpose of obtaining evidence of criminal acts" and acknowledging that purchasing or possessing any drugs outside the scope of the CI's work with the Task Force was illegal and would be prosecuted. The CI also agreed to allow the Task Force to electronically monitor him/herself and his/her property. The agreement does not explicitly grant the Task Force permission to intercept or open any mail that might be sent to the CI.

The CI communicated with Gardenier via text messages, which were forwarded to Agent Noe. Agent Noe often instructed the CI how to respond to Gardenier, but he was not typically present when the messages were exchanged. Via text, Gardenier agreed to ship ecstasy tablets to the CI but expressed concern about using the regular mail because other packages she had sent recently had

gone missing or been delayed. (The packages had been intercepted by Homeland Security.) She directed the CI to deposit $800 into a Wells Fargo Bank account, and law enforcement deposited that sum on November 17, 2011. Upon receipt of the pills, the CI was to deposit an additional $1,050. The CI learned that Gardenier actually sent 1,000 pills, 500 of which were intended for another recipient. Gardenier also informed the CI that the pills had been shipped via the United States Parcel Service (UPS), and that the package was addressed to "a dude's name" at the address where the CI had received the package on November 9. Gardenier provided the CI a tracking number for the package.

Law enforcement learned that UPS attempted delivery on Saturday, November 19, 2011, but that no one was able to sign for or retrieve the package and the package was currently "frozen" at the UPS facility in Bozeman. The facility was closed until Monday morning. Gardenier and the CI texted about the failed delivery. Gardenier was upset that the CI was not at home to receive the package. The CI indicated that she had not told her roommates to look for a package addressed to an alias and so they probably rejected the delivery. Gardenier indicated that the package could be redirected. At this time, Agent Noe testified that he still believed the package would be routed to the CI.

When UPS opened first thing Monday morning, November 21, another Task

Force member, Bozeman Police Detective Jim Veltkamp, seized the package. He observed that the package had allegedly been sent by "Jenny Hardinger" in Tukwila, Washington, and was addressed to "Brady Huand" in Bozeman. Brady Huand was not the name of the CI, but the detective recognized the delivery address as the CI's address, and recognized the sender's phone number as Gardenier's. The package bore the same tracking number that Gardenier had provided the CI.

Detective Veltkamp took the package to the Task Force headquarters and opened it. He discovered a UPS Mailer containing a cell phone box. Inside the box were two plastic baggies containing what appeared to be about 1000 yellow pills.

Later in the day, at approximately 3:17 p.m., UPS received a Delivery Change Request from Gardenier indicating that she would like the package to be delivered to a new address. From the CI, the Task Force knew that Gardenier was now in Bozeman, and the Task Force recognized the new address as Gardenier's sister's address.

Law enforcement planned a controlled delivery of the package to Gardenier at her sister's address. Prior to executing the controlled delivery, Detective Veltkamp applied for and received a search warrant for the package and the

delivery address, relying in part on the warrantless search of the package seized from the UPS facility.

Law enforcement executed the controlled delivery and the search warrant on November 22, 2011. Following the search, Detective Veltkamp reported that law enforcement found and seized several items, including the package; a piece of paper with a UPS tracking number; suspected marijuana and various paraphernalia; a "snort tube" and picture frame with powdery residue; empty capsules; and a brown bottle containing capsules.

Gardenier was present during the search of the home and apparently made several inculpatory statements during the interview performed at the site. She insists she felt compelled to make the statements because she was handcuffed and the officers' guns were drawn. Agent Noe and Detective Veltkamp, both of whom participated in the search, testified that all the officers' guns were drawn when they entered the home, but were holstered or put away after the house was "cleared," within two to five minutes. Per their usual practice, Gardenier was handcuffed initially while the residence was secured, and she was probably instructed to lie on the ground face-down. However, after the house was secured, Gardenier was seated in the living room and her handcuffs were removed. Agent Noe explained to her what was happening and calmed her down. He then

Mirandized her and began to interview her while other officers completed the search. Throughout the interview, the officers' guns were holstered or put away and Gardenier was not handcuffed. However, Gardenier probably saw the officers' weapons as they walked in and out of the room.

ANALYSIS

**A.    Search of Package**

Letters and packages in the mail system are subject to the protection of the Fourth Amendment. *United States v. Jacobsen*, 466 U.S. 109, 114 (1984). Thus, absent some exception, a warrant is required to search or seize an item that is sent in the mail. The government must prove the existence of an exception to the Fourth Amendment warrant requirement by a preponderance of the evidence. *United States v. Vasey*, 834 F.2d 782, 785 (9th Cir. 1987).

Both the sender and addressee of a mailed package have privacy and possessory interests in it. *United States v. Hernandez*, 313 F.3d 1206, 1209 (9th Cir. 2002). They share a "legitimate interest that a mailed package will not be opened and searched en route." *Id.* (citing *Jacobsen*, 466 U.S. at 114); *see also Ex parte Jackson,* 96 U.S. 727, 733, 24 L.Ed. 877 (1877) ("Letters and sealed packages of this kind in the mail are as fully guarded from examination and inspection, except as to their outward form and weight, as if they were retained by

6

the parties forwarding them in their own domiciles.").  However, their interest in

the package is limited.  *Hernandez*, 313 F.3d at 1209.  As with a phone

conversation or a shared apartment, either party with a protectable interest has the

power to cede his privacy interest to a third party.  *See United States v. Meek*, 366

F.3d 705, 711 (9th Cir. 2004) (citing *United States v. Karo*, 468 U.S. 705, 726

(1984) (While "[e]ach has standing to challenge the use as evidence of the fruits of

an unauthorized search of that [exchange], ... either may also give effective

consent to the search."); *Katz v. United States*, 389 U.S. 347 (1967) (holding that

either party to a private telephone conversation may consent to electronic

surveillance)).   That is, either the sender or addressee of a package can consent to

a search of the package.

The parties do not dispute that Gardenier sent the package, even though the

return label read "Jenny Harbinger."  As the sender of the package, Gardenier had

a legitimate expectation of privacy in it.[1]  She thus has standing to challenge the

warrantless seizure of the package from the UPS facility and the subsequent search

---

[1]The government cites Judge O'Scannlain's concurring opinion in *United States v. Lozano*, 623 F.3d 1055, 1062 (9th Cir. 2010), for the proposition that Gardenier did not have a reasonable expectation of privacy in the package she had mailed because she was not the addressee.  However, Judge O'Scannlain was opining that the intended *recipient* of the package in that case did not have standing to raise a Fourth Amendment challenge to the seizure of the package because the package was addressed not to him, but to a "Bill Corner," a name he denied was his alias.  *Id.*  Here, Gardenier was the sender and clearly had a protectable interest in the package.

of the package at the Task Force headquarters.

However, the CI also had an expectation of privacy and a possessory interest in the package. Though the CI was not "Brady Huand," the name of the addressee on the package, the CI had arranged the mailing of the package with Gardenier, and had provided his/her mailing address to Gardenier. Furthermore, the CI knew that the package was addressed to "a dude's name" and later Gardenier informed her it was addressed to a "Brady." The CI also had the tracking number for the package and communicated extensively with Gardenier about receiving the package. The CI was clearly the intended recipient of the package, and Gardenier was aware of the CI's interest in the package. The CI thus had the authority to cede his/her interest in the package to law enforcement.

Voluntary consent is an exception to the warrant requirement. For third-party consent to be valid, the third-party must have actual or apparent authority to consent to the search. As its intended recipient, the CI had actual authority to consent to the seizure or search of the package, and based on his/her extensive dialogue with Gardenier about the package, law enforcement reasonably believed s/he had that authority. *Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990).

The CI did not explicitly consent to the search and seizure in question. No Task Force member called him/her before the seizure to obtain oral consent, and

the CI agreement provided by the government under seal does not address searches or seizures of property except for electronic monitoring. In fact, Agent Noe testified that he did not want the CI to know about the search at the time so that the CI would be able to believably continue discussing the pending delivery with Gardenier without alerting her to the operation.

Nonetheless, the CI consented to the search and seizure and ceded his/her interest in the package to law enforcement by agreeing to act as a confidential informant "for the purpose of obtaining evidence of criminal acts" and arranging the specific transaction at issue. The CI organized the purchase and delivery with the knowledge of and at the direction of law enforcement after acknowledging that purchasing or possessing any drugs outside the scope of the CI's work with the Task Force was illegal and would be prosecuted. The CI also provided law enforcement the tracking number for the package as well as all the text messages concerning the package. Finally, the CI understood from discussions with Agent Noe that he/she would never actually receive the package because law enforcement would intercept it first. Accordingly, the CI had ceded his/her interest in the package to the Task Force. Operating with the CI's consent, the Task Force was not required to obtain a search warrant before conducting the search and seizure.

Even if the Task Force had not had the CI's consent, the agents would have discovered the contents of the package upon executing the search warrant of Gardenier's sister's house. Even without the information the officers obtained by seizing the package from the UPS facility and opening it, Detective Veltkamp's search warrant application contained sufficient evidence to support the issuance of the warrant.

### B.    Search of Sister's Residence

Gardenier contends that the opening of the package was central to the issuance of the warrant to search her sister's house. She argues that the warrant for the search of the house was fruit of the poisonous tree and that all the evidence discovered must be suppressed.

Even if the warrantless search of the package had been illegal, the search warrant was supported by probable cause. "The mere inclusion of tainted evidence in an affidavit does not, by itself, taint the warrant or the evidence seized pursuant to the warrant. . . .  A reviewing court should excise the tainted evidence and determine whether the remaining, untainted evidence would provide a neutral magistrate with probable cause to issue a warrant." *Vasey*, 834 F.2d at 788 (citations omitted). Excising the warrantless search, Detective Veltkamp presented the following facts specific to Gardenier in his search warrant

application: the CI had arranged to purchase ecstasy from Gardenier and identified Gardenier in photo; Gardenier directed the CI to deposit $800 into a bank account and provided the account number; the money was deposited into the account by law enforcement; Gardenier advised the CI that the package had been shipped; Gardenier advised the CI that the package had been sent via UPS and would arrive in Bozeman later that day; Gardenier provided the CI a UPS tracking number for the package; UPS was unable to deliver the package; Gardenier advised the CI she would request that UPS redirect the package to her sister's residence where she would receive the package; Gardenier subsequently redirected the delivery to her sister's residence; and the Missoula River Drug Task Force was prepared to execute a controlled delivery of the package. (Doc. 14-1 at 4–7.) These facts are sufficient to establish probable cause to search the location where the package was to be delivered. Accordingly, even if the warrantless search were illegal, the search warrant and subsequent search were valid.

### C.    Gardenier's Statements to Law Enforcement

Gardenier appears to make two arguments for suppressing her statements to law enforcement. First, she argues that her statements were fruit of the warrantless search and seizure. Second, she argues that her statements were not voluntary under the Fifth Amendment because the officers' guns were drawn and she was

handcuffed. The first argument fails because there was probable cause for the search warrant. As to the second argument, the government has sustained its burden of showing that Gardenier's statements were voluntary.

Gardenier's statements would be suppressed if, based on the totality of the circumstances, her will was overborne and her capacity for self-determination critically impaired. *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973) (citation omitted). Several factors must be considered, including Gardenier's age, education, and intelligence, and the conduct of the law enforcement officers, including whether *Miranda* warnings were read, the length of the interrogation, and the repeated and prolonged nature of the questioning. *Id.* at 226–27; *United States v. Jenkins*, 938 F.2d 934, 938 (9th Cir. 1991); *United States v. Miller*, 984 F.2d 1028, 1031 (9th Cir. 1993).

Gardenier was 24 years old at the time of the search and interview. Her text messages in the instant case and her involvement in drug distribution as described by Agent Noe suggest that she is relatively intelligent. After the initial entry into her sister's home by law enforcement, Gardenier appeared nervous. However, Agent Noe conversed with her for some time to help her calm down, explaining what was happening. After that, he reported that she seemed relaxed. He read her her *Miranda* rights, which she waived, and then commenced the interview. It does

not appear that he brow-beat her into making statements. Though law enforcement initially entered the home with their guns drawn, and Gardenier was initially handcuffed, the house was secured within two to five minutes, Gardenier's handcuffs were removed, and all weapons were holstered or put way. Several minutes elapsed after the initial entry before the interview began. Gardenier was seated on furniture in the living room and was not handcuffed during the interview. She was given the opportunity to request a lawyer or to remain silent, but did neither, and she willingly talked with Agent Noe and she was not arrested afterwards. Based on the totality of the circumstances, the Court does not believe that her will was overborne, and therefore her statements will not be suppressed.

## CONCLUSION

In summary, the warrantless search of the package was legal because the CI ceded his/her privacy interest in it to law enforcement by consenting to arrange the transaction for the Task Force and providing the Task Force all information related to the package with the knowledge that the package would be intercepted before it reached his/her possession. Even if the warrantless search were illegal, the contents of the box would subsequently have been discovered upon the completion of the search of Gardenier's sister's home. The warrant for that search

was supported by probable cause even after the information from the warrantless search is excised. Finally, based on the totality of the circumstances, Gardenier's statements during the interview at her sister's home were voluntary and will not be suppressed.

Accordingly, IT IS ORDERED that Gardenier's motion to suppress (doc. 14) is DENIED in full.

Dated this 7th day of November 2012.

Dana L. Christensen, District Judge
United States District Court